2013 UT 72

**STATE of Utah, Petitioner,**

v.

**Wesley Howard MACHAN, Respondent.**

**No. 20110961.**

Supreme Court of Utah.

Dec. 3, 2013.

Brian L. Tarbet, Interim Att'y Gen., Karen A. Klucznik, Asst. Att'y Gen., Salt Lake City, for petitioner.

Karen Stam, Joan C. Watt, Peter A. Daines, Salt Lake City, for respondent.

Justice DURHAM, opinion of the Court:

## INTRODUCTION

¶ 1 Wesley Machan was charged with aggravated burglary, aggravated assault, and commission of domestic violence in the presence of a child after he entered a home he owned with his estranged wife and brandished a rifle. Mr. Machan had been arrested and removed from the home six months prior to this incident and had been living in a separate residence due to a restraining order against him. Three weeks prior to his entry into the home, however, the restraining order expired. A magistrate found Mr. Machan could not be bound over on the aggravated burglary charge because there was insufficient evidence that he had relinquished his possessory interest in the home to render his entry unlawful within the meaning of Utah's burglary statute.

¶ 2 We affirm the magistrate's determination. Although an estranged spouse may implicitly relinquish his or her possessory rights to the marital home by voluntarily establishing a separate residence, the State did not produce evidence of voluntary relinquishment in this case.

## BACKGROUND

¶ 3 Mr. Machan and his wife have two sons who were approximately eleven and sixteen years old at the time of the events leading to this appeal. The Machans lived in a home that Mr. and Mrs. Machan had purchased together.

¶ 4 In 2010, Mr. Machan was arrested and removed from his home on charges not apparent in the record. When he was removed from the home, Mr. Machan did not take his house keys with him because they were not on his person when he was arrested. Soon after her husband's arrest, Mrs. Machan obtained a restraining order that prohibited Mr. Machan from seeing his children or going to the family home for 150 days. Mr. Machan stayed with his sister while the restraining order was in place. Mrs. Machan packed her husband's personal belongings, which were retrieved by Mr. Machan's sister. Mrs. Machan filed for divorce shortly after her husband's arrest. While the restraining order was in effect, Mr. Machan visited the house twice with the knowledge and consent of his wife.

¶ 5 About three weeks after the restraining order expired, Mr. Machan telephoned Mrs. Machan to say "goodbye." Mrs. Machan was shopping at the time, and inferred from this conversation that Mr. Machan was returning to his sister's house after staying with another relative. Later the same day, Mrs. Machan returned home with her two children and a friend. The older son unlocked the door, but discovered that it was barricaded from the inside. He looked through the partially open door and saw his father inside the home, holding a .22 caliber rifle that Mr. Machan had obtained from his older son's room. Mr. Machan called out to his wife, telling her to come inside, but the sixteen-year-old son closed the door and told

his mother to flee because his father had a gun. Mrs. Machan, her friend, and the younger son retreated to the friend's truck. As they ran from the house, Mr. Machan knocked out the screen to the front window and pointed the rifle at them.

¶ 6 Meanwhile, the older son had forced his way into the house and witnessed his father pointing the rifle out the window. The sixteen-year-old ran toward his father, struck him with his fists, and disarmed him. After immobilizing Mr. Machan, the older son dialed 911 and stayed on the phone with dispatch until police arrived and arrested his father.

¶ 7 The State charged Mr. Machan with aggravated burglary, aggravated assault, and commission of domestic violence in the presence of a child. At a bindover hearing, the magistrate found there was insufficient evidence that Mr. Machan had relinquished his right to enter the home and, therefore, the State could not prove the unlawful entry element of aggravated burglary. The court dismissed the aggravated burglary charge and bound over Mr. Machan on the charges of aggravated assault and domestic violence in the presence of a minor. The State petitioned for interlocutory review of the magistrate's bindover determination, and we agreed to hear the State's interlocutory appeal.

## STANDARD OF REVIEW

¶ 8 To bind a defendant over for trial, the State must produce "evidence sufficient to support a reasonable belief that the defendant committed the charged crime." *State v. Maughan*, 2013 UT 37, ¶ 14, 305 P.3d 1058 (internal quotation marks omitted). In determining whether the State has met this burden, a magistrate "must view all evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution." *Id.* (internal quotation marks omitted). "An inference is reasonable unless it falls to a level of inconsistency or incredibility that no reasonable jury could accept it." *Id.* (internal quotation marks omitted).

¶ 9 Magistrates may make only very limited credibility determinations when evaluating the evidence presented in a bindover hearing. *State v. Virgin*, 2006 UT 29, ¶ 24, 137 P.3d 787. "It is inappropriate for a magistrate to weigh credible but conflicting evidence at a preliminary hearing" because this function is reserved for the trier of fact. *Id.* "[M]agistrates may only disregard or discredit evidence that is wholly lacking and incapable of creating a reasonable inference regarding a portion of the prosecution's claim." *Id.* (internal quotation marks omitted).

¶ 10 When reviewing a bindover determination made under these standards, appellate courts afford the magistrate's ruling "limited deference." *Id.* ¶ 34; *accord Maughan*, 2013 UT 37, ¶ 12, 305 P.3d 1058; *State v. Ramirez*, 2012 UT 59, ¶ 7, 289 P.3d 444. Examining the factors relevant to the level of deference given to a lower court's resolution of the mixed question of whether to bind over a defendant, we have held that a magistrate is entitled to "some deference." *Virgin*, 2006 UT 29, ¶¶ 26–35, 137 P.3d 787. However, "because in the bindover context a magistrate's authority to make credibility determinations is limited[,] ... an appellate court should grant commensurate limited deference to a magistrate's application of the bindover standard to the facts of each case." *Id.* ¶ 34.

## ANALYSIS

¶ 11 "An actor is guilty of burglary who enters or remains unlawfully in a building or any portion of a building with intent to commit ... a felony...." UTAH CODE § 76-6-202(1). An entry is unlawful if "the premises are not open to the public" and "the actor is not otherwise licensed or privileged to enter ... the premises." *Id.* § 76-6-201(3). An aggravated burglary conviction requires proof of all of the elements of burglary, as well as evidence of one of several aggravating factors, including the threatened use or possession of a dangerous weapon. *Id.* § 76-6-203(1).

¶ 12 The principal contested issue at the bindover hearing was whether the State

had produced "evidence sufficient to support a reasonable belief" that Mr. Machan's entry into the family residence was unlawful. *State v. Maughan,* 2013 UT 37, ¶ 14, 305 P.3d 1058 (internal quotation marks omitted). Because the restraining order was no longer in effect, and because Mrs. Machan had not obtained an order establishing the parties' rights to the marital home in the pending divorce proceedings, Mr. Machan did not unlawfully enter the home in violation of a court order. *See State v. Byars,* 823 So.2d 740, 745 (Fla.2002) ("A court order can negate a person's right to enter the premises even if that person owns the premises." (internal quotation marks omitted)). The State asserts, however, that Mr. Machan relinquished his privilege to enter the home by establishing a separate residence, making his presence in the home unlawful within the meaning of Utah's burglary statute. Our case law has not addressed the conditions under which an estranged spouse may burglarize the family home absent a court order excluding the spouse. We look, therefore, to other states that have addressed this issue.

■ ¶ 13 A title owner of a dwelling is not always privileged to enter the premises. For example, a landlord may burglarize the dwelling of a tenant because the landlord conveys the right of possession to the tenant. *See State v. Spence,* 768 N.W.2d 104, 109 (Minn.2009). Thus, the proper focus of our inquiry is whether Mr. Machan surrendered his possessory rights to the family home prior to his entry and alleged assault. *See State v. Hagedorn,* 679 N.W.2d 666, 670 (Iowa 2004) ("[W]hether one has a right or privilege to enter property is not determined solely by his or her ownership interest in the property, or by whether the structure can be characterized as the 'marital home.' Rather

the focus under our burglary statute is on whether the defendant had any possessory or occupancy interest in the premises at the time of entry."); *People v. Hollenbeck,* 944 P.2d 537, 538–39 (Colo.App.1996).

■ ¶ 14 Other states that have examined this question have found that a spouse may relinquish a possessory interest in a dwelling the couple had previously shared as tenants in common, but that such a relinquishment could only be achieved through mutual consent:

> [T]he question whether one spouse has the sole possessory interest in [a marital residence] depends on whether the evidence shows that both parties had decided to live separately. Simply ordering a spouse out of the house and changing the locks does not establish this. Both parties must have understood that the possessory interest of one was being relinquished, even if such interest is relinquished begrudgingly or reluctantly.

*Hollenbeck,* 944 P.2d at 539; *accord State v. O'Neal,* 103 Ohio App.3d 151, 658 N.E.2d 1102, 1104 (1995) ("[T]he question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that *both* parties had made the decision to live in separate places."). We thus agree with the Minnesota Supreme Court that a cotenant's waiver of possessory rights to a shared home is properly grounded in contract law. *Spence,* 768 N.W.2d at 109–10. Under these principles, it is generally a jury question whether the parties' actions give rise to an implied-in-fact contract transferring the sole right of possession to the spouse who remains in the home.[1] *Id.* at 110.

---

1. Of course, implied contracts generally require consideration to be valid, which may often be lacking where an estranged spouse moves out of the marital home. *See In re Penn Cent. Transp. Co.,* 831 F.2d 1221, 1228 (3d Cir.1987) ("The elements necessary to form an implied-in-fact contract are identical to those required for an express agreement."). Promissory estoppel, however, may act as a substitute for consideration in appropriate cases. *Ravarino v. Price,* 123 Utah 559, 260 P.2d 570, 575 (1953) ("Promissory estoppel is historically rooted as a substitute for consideration, … [and may be] applied

where the promise of the promisor as to his future conduct constitutes the intended abandonment of an existing right on his part."). For example, where a spouse relies upon the other spouse's implied promise to relinquish possession of a shared home by failing to obtain a restraining order or other judicial decree declaring the parties' rights to the home, detrimental reliance on the promise may justify enforcement of the contract. *See id.* (" 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and

¶ 15 Utah Code section 30–2–10 confirms that any relinquishment of a spouse's possessory right to the marital home must be voluntary: "Neither the husband nor wife can remove the other or their children from the homestead without the consent of the other, unless the owner of the property shall in good faith provide another homestead suitable to the condition in life of the family. . . ." By statute, therefore, consent is a necessary requirement for any nonjudicial forfeiture of a spouse's right to enter the homestead.[2]

¶ 16 Other jurisdictions that have examined the question of whether a spouse or cotenant has relinquished possessory rights to a previously shared dwelling in the context of a burglary charge have identified several relevant considerations. Courts look foremost to whether a spouse or cotenant has voluntarily moved out of a shared home and established a separate residence. *State v. O'Neal*, 87 Ohio St.3d 402, 721 N.E.2d 73, 82 (2000) (husband "moved out and began living somewhere else"); *Hagedorn*, 679 N.W.2d at 671 (husband "by his own volition no longer resided" in the home he had shared with his wife); *People v. Ulloa*, 180 Cal.App.4th 601, 102 Cal.Rptr.3d 743, 749 (2009) (husband "voluntarily moved out of the apartment"). Additionally, courts have examined whether a spouse or cotenant has removed personal belongings. *Hollenbeck*, 944 P.2d at 539. Courts also look to whether a spouse or cotenant has willingly relinquished keys to the residence, evidencing an understanding that the excluded party could no longer enter at will. *Spence*, 768 N.W.2d at 111 (cotenant was unaware that her former live-in boyfriend still had a key, and testified that he should not have had one); *State v. McMillan*, 158 N.H. 753, 973 A.2d 287, 294 (2009) (defendant "no longer had a key"); *People v. Gill*, 159 Cal.App.4th 149, 70 Cal.Rptr.3d 850, 867 (2008) (defendant surrendered his house keys without objection). Surreptitious entry or obtaining admittance through violence may also support an inference that a spouse or cotenant understood that he or she had relinquished possessory rights to the home. *Spence*, 768 N.W.2d at 111 (surreptitious entry in the middle of the night); *McMillan*, 973 A.2d at 294 (defendant obtained "violent entry into the apartment" by kicking down a door); *Gill*, 70 Cal.Rptr.3d at 852 (husband gained entry by breaking into the home at 1:00 a.m.).

¶ 17 These considerations do not constitute an exhaustive list of relevant conduct informing the question of whether a defendant has consented to relinquish possessory rights by implication. An agreement implied in fact is inferred "from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules, Inc. v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (internal quotation marks omitted). Thus, any conduct that tends to prove or disprove the existence of a mutual agreement for one spouse to relinquish a possessory right in the marital home is relevant.

¶ 18 In this case, the magistrate applied the correct legal test to determine whether a reasonable jury could find that Mr. Machan unlawfully entered the home he had previously shared with his family. The magistrate ruled that a spouse could not unilaterally revoke the other spouse's possessory right to the marital home, but that the right to possession could be terminated through an implicit agreement. The magistrate found that the State presented insufficient evidence of such a mutual agreement here. The magistrate did not abuse his limited discretion in making this determination.

¶ 19 There is no evidence that Mr. Machan voluntarily moved out of the marital home. Instead, Mr. Machan was arrested and removed from the home by police. The subsequent restraining order prohibited him from

which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise.' " (quoting Restatement (First) of Contracts § 90 (1932))).

2. Although Utah Code section 30–2–10 does not apply to unmarried cotenants, contract principles similarly require a consensual relinquishment of possessory rights before one cotenant's entry into the home becomes unlawful. *Spence*, 768 N.W.2d at 109–10 (requiring consensual relinquishment of the right of possession for a burglary conviction where an unmarried couple purchased a home together).

returning to the residence for the next 150 days. Thus, Mr. Machan's removal from the home and subsequent absence during this time period could not support an inference that he had implicitly agreed to forfeit his right of possession. And the fact that his wife packed his personal belongings, which were retrieved by Mr. Machan's sister, likewise does not bespeak a voluntary relinquishment of Mr. Machan's property rights. Although Mrs. Machan's unilateral removal of his belongings demonstrates her intent to remove her husband from the residence, her intent alone is insufficient.

¶ 20 The State argues that because Mr. Machan did not take his house keys when he was initially arrested and removed from the home, he abandoned his right to return. But the record reflects that Mr. Machan simply did not have keys to the house on him when he was arrested. He did not voluntarily relinquish his keys. *See Gill,* 70 Cal.Rptr.3d at 867.

¶ 21 The State also asserts that the fact that Mr. Machan's wife gave him permission to enter the home twice during the pendency of the restraining order indicated an understanding that Mr. Machan could only enter the property after obtaining a license to do so from his wife. During this period of time, however, the restraining order obtained by Mrs. Machan prohibited his presence on the property. Therefore, any permission to enter the home while the restraining order was in place merely evidences an agreement not to inform the authorities of the violation of the restraining order, rather than an agreement to relinquish Mr. Machan's possessory rights.

¶ 22 As additional support for its argument that Mr. Machan had relinquished his possessory rights, the State presented evidence that after Mr. Machan was arrested and removed from the home his wife paid the mortgage. But the State presented no evidence of who contributed to the mortgage payments prior to his arrest, so there is no indication that Mr. Machan changed his behavior. Undoubtedly many spouses do not make mortgage payments, but this alone does not indicate an intent to abandon all possessory rights to the marital home.

¶ 23 Finally, the State argues that Mr. Machan's failure to reestablish his residency for approximately three weeks after the restraining order had lapsed shows that he intended to relinquish his right to enter the marital home. In some instances an extended absence from the home may give rise to an inference of a mutual agreement to relinquish one spouse's possessory right. However, the relatively short amount of time between the expiration of the restraining order and Mr. Machan's subsequent reentry into the home is insufficient, by itself, to support such an inference here. A failure to act, moreover, is less indicative of the existence of an implied agreement than affirmative acts consistent with such an agreement. Absent other evidence of affirmative acts demonstrating an intent to relinquish his possessory rights, Mr. Machan's three-week absence from the home is insufficient to demonstrate an intent to relinquish his possessory rights.

¶ 24 Examining the totality of the evidence, we conclude the magistrate did not abuse his limited discretion by finding that the State's evidence was insufficient to support a reasonable belief that Mr. Machan implicitly agreed to relinquish his possessory right to the family home. Although the State's burden in the bindover hearing is light, we cannot say that the magistrate erred in determining the State did not carry that burden here.

## CONCLUSION

¶ 25 We affirm the magistrate's ruling dismissing Mr. Machan's aggravated burglary charge and remand for trial on the remaining charges.

Justice DURHAM authored the opinion of the Court, in which Chief Justice DURRANT, Associate Chief Justice NEHRING, Justice PARRISH, and Justice LEE joined.