2014 UT App 142

**STATE of Utah, Plaintiff and Appellant,**

v.

**Adam Howard JONES, Defendant and Appellee.**

No. 20120754–CA.

Court of Appeals of Utah.

June 19, 2014.

Sean D. Reyes and John J. Nielsen, for Appellant.

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11-201(6).

Ronald J. Yengich, for Appellee.

Senior Judge PAMELA T. GREENWOOD authored this Opinion, in which Judge JAMES Z. DAVIS concurred.[1] Judge MICHELE M. CHRISTIANSEN concurred in part, concurred in the result in part, and dissented in part, with opinion.

GREENWOOD, Senior Judge:

¶ 1 The State appeals from the magistrate's dismissal of criminal charges against defendant Adam Howard Jones. The State charged Jones with one count of official neglect and misconduct, a class A misdemeanor, *see* Utah Code Ann. § 10-3-826 (LexisNexis 2012); one count of official misconduct, a class B misdemeanor, *see id.* § 76-8-201; and one count of tampering with a witness, a third degree felony, *see id.* § 76-8-508(1). The magistrate dismissed all three counts after a preliminary hearing, determining that there was insufficient evidence to bind Jones over for trial on any of the three counts. We affirm.

## BACKGROUND

¶ 2 At the time of the events giving rise to this case, Jones was the police chief of Kamas, Utah. Jones's brother, Travis, lived in Kamas with his girlfriend (Girlfriend). Jones knew that Travis had a history of alcohol abuse and resulting violent behavior and that Travis's alcohol abuse had led to incidents of domestic violence with Girlfriend. In the past, Girlfriend had called Jones for help with Travis when Travis was drunk, although these calls had previously occurred only when Jones was off duty. Some of these calls occurred as much as six years earlier, when Travis and Girlfriend lived in West Valley City. Girlfriend had not called Jones about problems with Travis for approximately one year.

¶ 3 On February 15, 2011, Jones was on duty in his office. His shift was to end at 10:00 p.m. At about 9:45 p.m., Girlfriend called Jones on his personal cell phone and asked him to come to the house that she

shared with Travis. Jones later told the State's investigator that he asked Girlfriend why she wanted him to come over, but she did not give him a reason, and that he assumed the call was about problems concerning her son. In any event, Jones immediately left his office, in uniform, and drove his police cruiser the four blocks to Travis's house.

¶ 4 When Jones arrived at the house, he was met by a drunken Travis clad only in his underwear. Travis was calm, although inebriated. Travis pointed to scratch marks on his chest and told Jones, "[L]ook what [Girlfriend] did to me." Jones then located Girlfriend in the garage, where she told Jones, "[Travis] can't do this to me anymore," that Travis was "out of control," and that he had kicked her in the leg. Jones examined Girlfriend's leg but observed no injury or impairment in her ability to walk.

¶ 5 While Jones and Girlfriend were talking, Travis entered the garage and again accused Girlfriend of scratching his chest. Girlfriend told Jones that Travis had scratched himself and asked Jones to calm Travis down. Jones responded that he could not deal with Travis because the two were brothers and asked Girlfriend if she wanted to call the Summit County Sheriff's Office to file a report. She declined, telling Jones that she was not afraid of Travis. Jones then spoke with Travis alone, and Travis admitted that he had scratched himself in an effort to get Girlfriend arrested.

¶ 6 Travis appeared to be on the verge of passing out, so Jones put him to bed and told the couple to stay away from each other. Jones also told them that if they wanted to make a police report they would have to call the sheriff's office because Jones could not become professionally involved in his own family matters. Jones left Travis's house after being there a total of fifteen to twenty minutes and clocked out from his shift a little after 10:00 p.m. Jones did not arrest or cite Travis, write a report about the incident, or give Girlfriend written notice of her rights as a domestic violence victim.

¶ 7 A short time later, Jones observed on his home computer that sheriff's deputies had been dispatched to Travis's house. When the deputies arrived there, they found Girlfriend crying and obviously distraught, with injuries that included bruising on her leg. Girlfriend's ten-year-old son had also suffered injuries. The deputies arrested Travis, who was loud, vulgar, and very aggressive. Deputies also learned that Jones had been at the house earlier. Jones monitored the situation on his police radio, but the details of what he may have heard are unknown. Later that night, Girlfriend called Jones again. Jones assumed that Girlfriend was calling about Travis and did not answer his phone.

¶ 8 The next morning, Jones went to visit Travis in jail. Travis was in a holding cell near the booking counter, and the sheriff's deputy working at the counter overheard parts of their conversation. Jones told Travis that Jones had been at Travis's house the night before, that Travis was passed out in his bed while Jones was there, and that Travis needed to do something about his drinking. As Jones was leaving, he spoke with the deputy directly about the prior evening's events and repeated his statement that Travis was passed out while Jones was at the house. He also told the deputy that Girlfriend had indicated in the phone call that he needed to come over to "talk or take care of" Travis.

¶ 9 As a result of these incidents, the State charged Jones with official neglect and misconduct—or, in the alternative, the lesser offense of official misconduct—for his handling of the incident between Travis and Girlfriend on the night of February 15. The State's theory of misconduct under both counts was that Jones had failed to comply with the requirements imposed on law enforcement officers by Utah's Cohabitant Abuse Procedures Act, see Utah Code Ann. §§ 77–36–1 to –10 (LexisNexis 2012 & Supp. 2013). The State also charged Jones with witness tampering because of his statements to Travis during the jail visit the next morning, where he told Travis that he had been passed out during Jones's visit.

¶ 10 At Jones's preliminary hearing, the State called only three witnesses. Craig Gibson, the State's investigator, testified about

his March 7, 2011 interview of Jones, a transcript of which was admitted into the record.[2] Sheriff's Deputy Richard Jones described his response to the dispatch call from Travis's house on the night of February 15 after Jones had been there. And Sheriff's Deputy Trace Thomsen testified about statements that Jones made to both him and Travis at the jail on the morning of February 16.

¶ 11 After the preliminary hearing, Jones filed a motion to dismiss, which the magistrate granted as to all three counts. In its dismissal order, the magistrate ruled that the State had failed to demonstrate probable cause to believe that Jones had committed any of the three charged crimes. As to the official neglect and misconduct charge, the magistrate ruled that Jones was only alleged to have violated his duty as a police officer, not as a municipal officer as required by Utah Code section 10-3-826, and that the appropriate misconduct charge was therefore official misconduct pursuant to section 76-8-201. As to the official misconduct charge, the magistrate ruled that Jones was under no obligation to comply with the duties imposed upon police officers responding to domestic violence incidents because he went to Travis and Girlfriend's house as a family member, Girlfriend's call did not mention domestic violence, and there was no altercation occurring when Jones arrived at the house. Finally, as to the charge of witness tampering, the magistrate ruled that there was no evidence of one of the elements of the crime: that Jones believed that an official proceeding relating to his actions was pending or about to be initiated at the time he spoke to Travis in the jail. The State appeals from the magistrate's dismissal order.

### ISSUE AND STANDARD OF REVIEW

¶ 12 The State argues that the magistrate erred in dismissing each of the three charges against Jones at the bindover stage. The magistrate's bindover decision "is a mixed determination that is entitled to some limited deference." *State v. Maughan,* 2013 UT 37, ¶ 12, 305 P.3d 1058; *see also State v. Machan,* 2013 UT 72, ¶ 18, 322 P.3d 655 (describing the magistrate's discretion at the bindover stage as "limited discretion"). The State is entitled to have a defendant bound over for trial if it presents "evidence sufficient to support a reasonable belief that the defendant committed the charged crime," and in making its bindover determination the magistrate "must view all evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution." *Maughan,* 2013 UT 37, ¶ 14, 305 P.3d 1058 (citations and internal quotation marks omitted).

### ANALYSIS

¶ 13 The magistrate dismissed the three counts against Jones on three distinct rationales. We examine each of the magistrate's rulings in turn and determine that each ruling was an appropriate exercise of the magistrate's "limited discretion." *See Machan,* 2013 UT 72, ¶ 18, 322 P.3d 655.

### I. Official Neglect and Misconduct

¶ 14 The magistrate first addressed the charge of official neglect and misconduct. Official neglect and misconduct, a class A misdemeanor, occurs when "any municipal officer shall at any time wilfully omit to perform any duty, or wilfully and corruptly be guilty of oppression, malconduct, misfeasance, or malfeasance in office." Utah Code Ann. § 10-3-826 (LexisNexis 2012).[3] The State charged Jones with one count of official neglect and misconduct, alleging that, as the Kamas police chief, Jones was a municipal officer and that he failed to perform his duties when he did not comply with the requirements of the Cohabitant Abuse Procedures Act (the Act) while responding to an incident of domestic violence at Travis's

---

2. The interview focused on Jones's actions on the night of February 15, and there were no questions or discussions about his visit to Travis in jail the next morning.

3. In addition to constituting a class A misdemeanor, conviction of a municipal officer for official neglect and misconduct also mandates removal from office and ineligibility "for any municipal office thereafter." *See* Utah Code Ann. § 10-3-826 (LexisNexis 2012).

house.[4]

¶ 15 In dismissing the official neglect and misconduct charge, the magistrate concluded that Utah Code section 10–3–826 "talks about official neglect and misconduct and encompasses the special functions of the municipal officer" and that "[t]hose types of functions do not relate to the general duties of a police officer." The magistrate also referred to Kamas City Ordinance # 02–1, which governs the Kamas police department,[5] to determine that Jones was alleged to have violated not his duties as the police chief but rather his general duties as a police officer under paragraph 3 of the ordinance. *See* Kamas, Utah, Ordinance # 02–1, para. 03 (May 28, 2002) (enumerating the additional powers and duties of policemen). Accordingly, the magistrate concluded that the appropriate charge was official misconduct under Utah Code section 76–8–201 and declined to bind Jones over on official neglect and misconduct under section 10–3–826.

■ ¶ 16 We agree with the magistrate's legal ruling regarding the meaning of the statute and ordinance. There was no evidence that Jones was acting in his capacity as the police chief—i.e., failing to perform a duty arising exclusively from his status as the police chief—when he went to Travis's house on the night of February 15. *Cf. State v. Tolman,* 775 P.2d 422, 425 (Utah Ct.App. 1989) (interpreting official misconduct statute

to apply only to public servants acting in their capacity as public servants). Any duties under the Act arose only due to Jones's general status as a police officer. *See, e.g.,* Utah Code Ann. § 77–36–2.1(1) (LexisNexis 2012) ("A *law enforcement officer* who responds to an allegation of domestic violence shall use all reasonable means to protect the victim.…" (emphasis added)). Further, to the extent that Kamas City Ordinance # 02–1 imposed an independent duty on Jones to comply with the Act, that duty applied to *all* Kamas police officers and not exclusively to the police chief. *See* Kamas, Utah, Ordinance # 02–1, para. 03 ("The chief of police and all police officers of the City shall have the following powers and duties.…").

■ ¶ 17 In sum, the magistrate correctly interpreted Utah Code section 10–3–826 as being limited to acts or omissions relating to the special functions of a municipal officer in his or her capacity as a municipal officer. The magistrate also properly determined that there is no evidence that Jones failed to perform any duty imposed upon him by virtue of his status as the Kamas police chief, as opposed to his status as a Kamas police officer or a police officer generally. Accordingly, the magistrate appropriately declined to bind Jones over for trial on the charge of official neglect and misconduct under Utah Code section 10–3–826.

4. The Act imposes various duties on law enforcement officers responding to reports of domestic violence. Among these duties are that "[a] law enforcement officer who responds to an allegation of domestic violence shall use all reasonable means to protect the victim and prevent further violence," Utah Code Ann. § 77–36–2.1(1) (LexisNexis 2012), and "shall give written notice to the victim in simple language, describing the rights and remedies available" to the victim under Utah statutes addressing cohabitant abuse and child protective orders, *id.* § 77–36–2.1(2)(a). The Act requires that a law enforcement officer responding to a domestic violence call "shall arrest without a warrant or shall issue a citation to any person that the peace officer has probable cause to believe has committed an act of domestic violence." *Id.* § 77–36–2.2(2)(a) (Supp.2013). The Act also imposes certain reporting requirements, including the requirement that an officer "who does not make an arrest after investigating a complaint of domestic violence … shall submit a detailed, written report specifying the

grounds for not arresting any party." *Id.* § 77–36–2.2(5)(a). Additionally, "[a] law enforcement officer responding to a complaint of domestic violence shall prepare an incident report that includes the officer's disposition of the case." *Id.* § 77–36–2.2(6)(a). It is undisputed in this case that Jones did not give Girlfriend written notice of her rights and remedies, did not arrest or cite Travis for domestic violence, and did not file either a failure-to-arrest report or an incident report.

5. Kamas City Ordinance # 02–1 establishes both the Kamas Police Department and the position of chief of police. *See* Kamas, Utah, Ordinance # 02–1, para. 01 (May 28, 2002). Certain duties under the ordinance are exclusive to the municipal office of police chief, including the duty to "organize, supervise, and be responsible for all the activities of the police department" and to "execute all lawful orders of the Mayor and City Council." *See id.* para. 02.

## II. Official Misconduct

¶ 18 The magistrate next addressed the State's alternative charge of official misconduct, a class B misdemeanor. *See* Utah Code Ann. § 76–8–201 (LexisNexis 2012). Official misconduct is committed when "[a] public servant . . . knowingly refrains from performing a duty imposed on him by law or clearly inherent in the nature of his office" and does so "with an intent to benefit himself or another or to harm another." *See id.* The State's theory of official misconduct against Jones was that he was a public servant by virtue of his status as a police officer, that he failed to comply with his law enforcement duties under the Act when he responded to Girlfriend's allegation of domestic violence against Travis, and that he did so to benefit either himself or Travis.

¶ 19 The magistrate dismissed the official misconduct charge, stating that a police officer's duties under the Act "are predicated on the . . . officer responding to an allegation of domestic violence." The magistrate determined that Jones was not responding to an allegation of domestic violence because Girlfriend called him as Travis's brother, not as a police officer; Girlfriend's call did not mention domestic violence; and there was no ongoing altercation when Jones arrived at Travis's house. The magistrate concluded that "[t]here is no showing that [Jones] was responding to an allegation of domestic abuse, [and] therefore the [Act] and the duties arising under it have no application to [Jones] in this incident."

¶ 20 Again, we agree with the magistrate. The Act does not impose its duties on all police officers at all times but rather on police officers who are responding to allegations of domestic violence. *See, e.g.,* Utah Code Ann. § 77–36–2.1(1) (LexisNexis 2012) ("A law enforcement officer *who responds to an allegation of domestic violence* shall use all reasonable means to protect the victim . . . ." (emphasis added)). Further, this court has previously determined that a public servant does not commit the crime of official misconduct unless he or she acts in the "capacity" of a public servant. *See State v. Tolman,* 775 P.2d 422, 425 (Utah Ct.App. 1989) ("[T]he prosecution was required to prove that Tolman . . . acted in his capacity as a public servant. . . ."). Thus, Jones committed official misconduct under Utah Code section 76–8–201 only if he failed to perform a duty in his "capacity" as a police officer. *See id.*

¶ 21 Although the Act does not provide a definition of the type of police response that triggers the Act's various duties, a reading of the Act as a whole indicates that it is intended to apply only to official police responses to domestic violence. For example, the Act refers variously to "respond[ing] to an allegation of domestic violence," Utah Code Ann. § 77–36–2.1(1); "domestic violence call[s]," *id.* § 77–36–2.2(1) (Supp.2013); and "complaints of domestic violence," *id.* § 77–36–2.2(3). Read in the context of a statute governing the activities of law enforcement officers, the language employed by the legislature indicates that the Act's duties apply only when a police officer is making an official police response to a domestic violence incident.[6]

¶ 22 The State argues that the circumstances surrounding Jones's visit to Travis's house give rise to a reasonable inference that Jones was responding in a law enforcement capacity. These circumstances include the facts that Jones was on duty, in uniform, and driving a police vehicle; responded immediately to Girlfriend's call rather than waiting the fifteen minutes until he went off duty; and investigated the incident at Travis's house "as a police officer would." We must accept an inference as reasonable "unless it falls to a level of inconsistency or incredibility that no reasonable jury could accept it." *State v. Machan,* 2013 UT 72, ¶ 8, 322 P.3d 655 (citation and internal quotation marks omitted). However, we evaluate proposed inferences under the totality of the

6. Although we determine that the Act's duties are triggered only by official responses to domestic violence, we agree with the State that the Act is not limited to situations where a call to authorities specifically alleges domestic violence. Police officers have many different types of official interactions with the public, and whether any particular incident triggers the Act's duties depends on the circumstances.

circumstances, not just those circumstances that support the inference. *See State v. Graham*, 2013 UT App 109, ¶ 9, 302 P.3d 824 (stating that inferences to support a bindover must be evaluated "under the totality of the circumstances").

¶ 23 The totality of the circumstances of the February 15 incident includes undisputed evidence that Girlfriend called Jones on his personal cell phone and that Jones responded to that personal call solely in his capacity as Travis's brother. Gibson, the State's investigator, testified that he interviewed both Jones and Girlfriend and that both of them indicated that Jones was not called there in his police capacity. Thus, neither Jones nor Girlfriend believed Jones was present as a police officer. The evidence further indicates that Jones informed Girlfriend at the scene that he could not become professionally involved because he was Travis's brother and that Jones repeatedly offered to contact the sheriff's office if Girlfriend desired official law enforcement involvement.

¶ 24 Under the totality of the circumstances, we cannot accept as reasonable the State's proposed inference that Jones responded to Girlfriend's personal call as a police officer making an official response to a domestic violence call. The undisputed evidence is that Jones was summoned and responded solely as a family member. The evidence that the State relies on—Jones's police uniform and other accoutrements of official involvement—are consistent with an inference of official capacity when viewed in isolation but not when viewed in light of the undisputed testimony that Jones's visit to Travis's house was purely an unofficial family matter. In other words, in light of *all* of the evidence presented to the magistrate, the inference presented by the State "falls to a level of inconsistency or incredibility that no reasonable jury could accept it." *Machan*, 2013 UT 72, ¶ 8, 322 P.3d 655 (citation and internal quotation marks omitted).

¶ 25 In reaching this conclusion, we take some guidance from two Utah cases addressing the crime of assaulting a peace officer and, in particular, that crime's element that

an assaulted officer be "acting within the scope of authority as a peace officer" at the time of the assault. *See* Utah Code Ann. § 76–5–102.4(2)(a) (LexisNexis Supp.2013). In *State v. Gardiner*, 814 P.2d 568 (Utah 1991), a divided supreme court affirmed the defendant's conviction despite the fact that the assault occurred as the defendant was resisting an illegal search by the officer. *See id.* at 570–75. The court held that, despite the illegality of the search the officer was still acting within the scope of his authority at the time of the assault. *See id.* at 575. In analyzing the scope of authority question, the court employed the test of "whether an officer is doing what he or she was employed to do or is 'engaging in a personal frolic of his [or her] own.'" *Id.* at 574 (alteration in original) (quoting *United States v. Heliczer*, 373 F.2d 241, 245 (2d Cir.1967)).

¶ 26 In *Salt Lake City v. Christensen*, 2007 UT App 254, 167 P.3d 496, this court affirmed a conviction for assaulting a peace officer that arose from a uniformed officer's off-duty employment as a hospital security guard. *Id.* ¶¶ 12–13. The court concluded that the officer was acting within the scope of his authority as a peace officer at the time of the assault despite his private employment status, explaining,

> It is true that upon Defendant's arrival at the emergency room, [the officer] was acting as [a hospital] employee and not as a peace officer. But when Defendant took a defensive stance, clenched his fists, and made verbal threats of physical violence, [the officer's] primary role shifted from that of a security guard to that of a peace officer. It was in his law enforcement capacity that [the officer] took Defendant under control and prevented the escalation of further violence.

*Id.* ¶ 14. The court ultimately held that "when a law enforcement officer responds to preserve law and order or to detect and deter crime, he is acting 'within the scope of his authority as a peace officer' even though he may be working at another job." *Id.* (citation omitted).

¶ 27 Thus, at least for purposes of the crime of assaulting a peace officer,[7] we know

---

7. In *Christensen,* the court expressly stated,

Questions about the scope of a peace officer's

that even a uniformed, on-duty police officer is not acting within the scope of his law enforcement capacity while he engages in a "personal frolic." *Gardiner*, 814 P.2d at 574 (citation and internal quotation marks omitted). Conversely, even off-duty officers may act within the scope of their law enforcement capacity when they act "to preserve law and order or to detect and deter crime." *Christensen*, 2007 UT App 254, ¶ 14, 167 P.3d 496; *see also id.* ("[E]ven peace officers who are 'off duty' will typically spring into action when circumstances so require, i.e., when the law has been or is about to be broken.").

¶ 28 Analyzing the evidence presented below through the lenses of *Gardiner* and *Christensen*, Jones's initial decision to go to Travis's house in response to Girlfriend's personal call can be reasonably characterized only as a personal frolic to attend to family matters. When Jones arrived at the house and became aware of Girlfriend's allegation of domestic violence, he declined to "spring into action" and treat the situation as a law enforcement matter. *See Christensen*, 2007 UT App 254, ¶ 14, 167 P.3d 496. To the contrary, Jones advised Girlfriend that he could not become professionally involved because of his relationship to Travis, and he repeatedly offered to involve the sheriff's office to respond to the incident in an official law enforcement capacity. Girlfriend did not object to Jones's statements and, in fact, endorsed those statements. Furthermore, Jones observed no visible signs of domestic abuse—other than Travis's self-inflicted scratches—and, when Jones left the house, all was calm and Travis was sleeping in his bed. In short, nothing occurred during Jones's visit to the house to convert the

incident from a purely personal incident into a law enforcement matter.[8]

¶ 29 For all of these reasons, we agree with the magistrate that it cannot be reasonably inferred from the State's evidence that Jones's interaction with Travis and Girlfriend on the night of February 15 was anything other than a family matter. Because the evidence below, presented as a whole, does not support a reasonable inference that Jones was responding to a domestic violence allegation in his official capacity, we affirm the magistrate's refusal to bind Jones over for trial on the charge of official misconduct.

## III. Witness Tampering

¶ 30 Finally, the magistrate addressed the charge of witness tampering.

> A person is guilty of the third degree felony of tampering with a witness if, believing that an official proceeding or investigation is pending or about to be instituted, or with the intent to prevent an official proceeding or investigation, he attempts to induce or otherwise cause another person to . . . testify or inform falsely. . . .

Utah Code Ann. § 76-8-508(1) (LexisNexis 2012). The State's theory of witness tampering against Jones was that Jones believed that there would be an official investigation into his handling of the incident with Girlfriend and Travis. Jones then attempted to get Travis to cover up the events of that incident by telling Travis the next morning that he had been passed out during the time that Jones was at his house.

¶ 31 The magistrate dismissed the witness tampering charge after determining that there was no evidence that an official investigation into Jones's actions was pending or

---

authority arise in many different contexts, including respondeat superior, workers' compensation, and civil rights cases. We specifically note that our analysis and holding in this case should not be construed as applying in all contexts in which the question of an officer's authority may arise.
*Salt Lake City v. Christensen*, 2007 UT App 254, ¶ 13 n. 3, 167 P.3d 496.

8. We note that the officer in *Christensen* was not deemed to be acting in a law enforcement capacity until he reacted to the defendant's threat of immediate physical violence. *See* 2007 UT App

254, ¶ 14, 167 P.3d 496. The officer initially remained in his unofficial, security guard capacity despite his knowledge that the defendant was a suspect in a recent and serious domestic violence incident. *Id.* ¶ 3. The officer also remained in his unofficial capacity as he endured fifteen to twenty minutes of the defendant's "obscene outbursts," twice heard the defendant threaten to kill his brother upon being released from the hospital, and requested police backup due to the defendant's "large size, belligerent behavior, and the fact that he was a suspect in a domestic violence incident." *Id.* ¶ 4.

about to be instituted at the time he spoke with Travis. Perhaps more importantly, the magistrate found no evidence that Jones *believed* such an investigation was pending. *See Melessa v. Randall*, 121 Fed.Appx. 803, 807 (10th Cir.2005) (interpreting Utah Code section 76–8–508(1) as requiring a defendant's subjective belief "that an official proceeding or investigation is currently pending or will be initiated in the future"); *State v. Bradley*, 752 P.2d 874, 876–77 (Utah 1985) (per curiam) ("The statute requires no more than that a defendant *believe* an official proceeding or investigation to be underway."). In the absence of evidence that Jones believed that an official investigation into his actions at Travis's house was underway or would be initiated in the future, the magistrate concluded that the State had failed to adequately establish an element of the crime of witness tampering and declined to bind Jones over on that charge.[9]

 ¶ 32 On appeal, the State argues that Jones knew that Travis had been arrested for domestic violence shortly after Jones left the house. The State asks us to draw a reasonable inference that the resulting investigation of Travis would have necessarily led to an investigation of Jones's actions. The State also argues that the evidence that Jones "falsely told a certainly hung over and possibly memory-impaired Travis" that he was passed out during the incident gives rise to a reasonable inference that Jones wanted Travis to repeat the lie to investigators. We cannot accept either of the State's proposed inferences.

¶ 33 As discussed above, the totality of the evidence presented at the preliminary hearing shows that Jones went to Travis's house on the evening of February 15 solely on a family matter or "personal frolic" that did not constitute an official response to a domestic violence allegation. *See State v. Gardiner*, 814 P.2d 568, 574 (Utah 1991) (citation and internal quotation marks omitted). Further, there is nothing in the evidence to support an inference that, at any time during

Jones's visit, his "primary role shifted from that of a [family member] to that of a peace officer." *See Salt Lake City v. Christensen*, 2007 UT App 254, ¶ 14, 167 P.3d 496. Thus, the mere fact that Jones knew of both his own actions and Travis's domestic violence arrest provided Jones with no reason to believe that *his* actions were likely to be the subject of any sort of official investigation. We cannot infer Jones's belief of an official investigation from his actions when—based on the evidence presented below—those actions did not constitute a crime or otherwise suggest the likelihood of an investigation.

¶ 34 We also cannot agree that the mere fact that Jones told Travis that he was passed out gives rise to a reasonable inference that Jones believed an investigation was impending. *See generally State v. Garcia–Vargas*, 2012 UT App 270, ¶ 17 n. 5, 287 P.3d 474 ("[A]n inference is a deduction as to the existence of a fact which human experience teaches us can reasonably and logically be drawn from proof of other facts." (alteration in original) (citation and internal quotation marks omitted)). If there was some independent reason for Jones to believe that there would be an investigation, then his statement to Travis might give rise to an inference that he lied to Travis in order to impede that investigation. But in the absence of other evidence that Jones believed an investigation was likely, we cannot "reasonably and logically" deduce that Jones believed that an investigation was pending merely from the evidence that he told Travis that he was passed out. *See id.*

 ¶ 35 "Under Utah law, a magistrate is 'free to decline bindover where the facts presented by the prosecution provide no more than a basis for speculation-as opposed to providing a basis for a reasonable belief.'" *State v. Graham*, 2013 UT App 109, ¶ 17, 302 P.3d 824 (quoting *State v. Virgin*, 2006 UT 29, ¶ 21, 137 P.3d 787). "[S]peculation is defined as the 'act or practice of theorizing about matters over which there is no certain

---

9. The magistrate also ruled that Travis's potential testimony would have been irrelevant to any investigation into Jones's actions because Girlfriend was the only witness to Jones's allegedly improper response to her allegation of domestic

violence against Travis. We do not address this portion of the magistrate's ruling, but we note that Girlfriend and Jones both told the State's investigator that Travis was awake when Jones arrived at the house.

knowledge.'" *State v. Hester,* 2000 UT App 159, ¶ 16, 3 P.3d 725 (quoting Black's Law Dictionary 1407 (7th ed.1999)), *abrogated on other grounds by State v. Clark,* 2001 UT 9, 20 P.3d 300. In the absence of any other evidence that Jones believed that he would be subject to an official investigation, the State's proposed inference of Jones's belief from his alleged falsehood to Travis constitutes such speculation.

¶ 36 The State's proposed inference is also not the only possible explanation of Jones's statement such that the inference might be supported as the only explanation available. Indeed, it seems just as likely that Jones visited Travis in jail simply to check on his condition and told Travis that he had passed out—which Travis had apparently done before Jones left the house—so as not to prompt a discussion of the prior evening's events. If there was independent evidence to support the State's proposed inference, then there would be a question for a jury to resolve. *See State v. Maughan,* 2013 UT 37, ¶¶ 15–21, 305 P.3d 1058. But we see no other evidence to support the theory that Jones sought to impede an investigation of his actions.[10] In the absence of such evidence, the State's proposed inference asks us to infer Jones's belief in an investigation merely from the allegation that Jones told a falsehood about the past event that would have been the subject of the purported investigation. This represents speculation rather than reasoned and logical deduction. *See generally Garcia–Vargas,* 2012 UT App 270, ¶ 17 n. 5, 287 P.3d 474 (recognizing the "difference between drawing a reasonable inference and merely speculating about possibilities").

¶ 37 For these reasons, the magistrate appropriately determined that the State failed to produce evidence that Jones believed that there was, or would be, any official investigation into his actions at the time he made the alleged false statement to Travis. Because belief in a present or pending investigation is an element of the crime of witness tampering as charged against Jones, the magistrate properly declined to bind Jones over for trial on the witness tampering charge.

## CONCLUSION

¶ 38 The magistrate appropriately concluded that the State did not present "evidence sufficient to support a reasonable belief" that Jones violated any official duties during his visit to Travis's house on February 15 or that he believed that he would face official investigation when he falsely told Travis the next morning that Travis had been passed out during the visit. *See Maughan,* 2013 UT 37, ¶ 14, 305 P.3d 1058 (citation and internal quotation marks omitted). The magistrate therefore acted within its "limited discretion" in dismissing the charges of official neglect and misconduct, official misconduct, and witness tampering against Jones. *See State v. Machan,* 2013 UT 72, ¶ 18, 322 P.3d 655. Accordingly, we affirm the magistrate's dismissal order.

CHRISTIANSEN, Judge (concurring in part, concurring in the result in part, and dissenting in part):

¶ 39 I concur in the lead opinion's analysis in Section I regarding official neglect and misconduct in violation of Utah Code section 10–3–826 and concur in the result as to the conclusion reached in Section III regarding witness tampering in violation of Utah Code section 76–8–508(1). I disagree, however, with the lead opinion's determination in Section II that the magistrate correctly dismissed the charge of official misconduct in violation of Utah Code section 76–8–201, which provides that "[a] public servant is guilty of a class B misdemeanor if, with an intent to benefit himself or another, he ... knowingly refrains from performing a duty imposed on him by law or clearly inherent in the nature of his office." Utah Code Ann. § 76–8–201 (LexisNexis 2008). The magistrate determined, and the lead opinion agrees, that because Jones did not initially respond as a police officer to his brother's house on a domestic-violence call but rather as Travis's brother, and because no altercation occurred in Jones's presence between

---

10. To the contrary, Jones freely discussed the events at Travis's house with the State's investi-

gator, including the fact that Travis was *not* passed out when Jones arrived at the house.

Travis and Girlfriend, Jones was not acting in his official capacity as a law enforcement officer and was thus not required to perform the duties imposed on law enforcement officers by the Act. *See id.* § 77–36–2.1(1) ("A law enforcement officer who responds to an allegation of domestic violence shall use all reasonable means to protect the victim and prevent further violence...."); *id.* § 77–36–2.2(2)(a) (providing that an officer responding to a domestic violence call "shall arrest without a warrant or shall issue a citation to any person that the peace officer has probable cause to believe has committed an act of domestic violence"). I respectfully dissent as to Section II.

¶ 40 To begin, I agree that the Act "does not impose its duties on all police officers at all times, but rather on police officers who are responding to allegations of domestic violence." *See supra* ¶ 20. I also agree that the circumstances that prompted Jones's visit to Travis and Girlfriend's house on February 15, 2011, even while he was on duty, in uniform, and traveling in his police vehicle, do not alone give rise to a reasonable inference that Jones was responding in a law enforcement capacity to a domestic-violence call. And I agree that Jones's visit to Travis's house was initially "a purely unofficial family matter." *See supra* ¶ 24. However, I disagree with the magistrate's and the lead opinion's conclusion that, once he arrived at his brother's house and was informed of the situation for which it turns out he had been summoned, Jones did not at that point have a duty to officially respond as a law enforcement officer to Girlfriend's allegation of domestic violence. *See id.* § 77–36–2.1(1).

¶ 41 In my view, the lead opinion incorrectly concludes that "nothing occurred during Jones's visit to the house to convert the incident from a purely personal incident into a law enforcement matter." *See supra* ¶ 28. Rather, what admittedly started out as a

"personal frolic" turned into a situation requiring Jones to respond as a law enforcement officer once he discovered the situation at Travis and Girlfriend's house. Specifically, Jones arrived at his brother's residence armed with the knowledge of the violent history between Travis and Girlfriend and of Travis's tendency to become violent after consuming alcohol. Upon his arrival, Jones observed that Travis was intoxicated, found Girlfriend in her car talking on the phone, and learned from Girlfriend that "Travis was out of control," had allegedly kicked Girlfriend in the leg,[11] and had harmed himself.[12] Once he received Girlfriend's statement that Travis had allegedly assaulted her, Jones had a duty as a sworn peace officer "to preserve law and order [and] to detect and deter crime, [and act] within the scope of his authority as a peace officer." *Salt Lake City v. Christensen*, 2007 UT App 254, ¶ 14, 167 P.3d 496 (citation and internal quotation marks omitted). Jones was therefore obligated to discharge his duties under the Act. *See* Utah Code Ann. §§ 77–36–2.1, –2.2.

¶ 42 In passing the Act, our legislature has removed some of the discretion a police officer has in responding to allegations of domestic violence and has statutorily mandated certain procedures on the part of those police officers. "[B]ecause domestic violence is serious in nature and has a high likelihood of repeated violence, incidents of domestic abuse require the mandatory and immediate attention of law enforcement." *State v. Farrow*, 919 P.2d 50, 54 (Utah Ct. App.1996) (discussing the policy underlying the legislature's enactment of Utah Code title 77, chapter 36, then called the Spouse Abuse Procedures Act); *see also* Utah Code Ann. § 77–36–2.2(1) ("The primary duty of law enforcement officers responding to a domestic violence call is to protect the victim and enforce the law."). Given the mandato-

11. A criminal assault is, among other things, "an act, committed with unlawful force or violence, that causes bodily injury to another or creates a substantial risk of bodily injury to another." Utah Code Ann. § 76–5–102(1)(c) (LexisNexis 2012). An allegation of a kick in the leg can therefore constitute an allegation of assault.

12. It is less clear what duty Jones may have had in response to Travis's initial allegation of domestic abuse against Girlfriend, given Travis's later admission that the allegation was false. *See supra* ¶ 5. However, because Girlfriend's allegation was sufficient to trigger Jones's duties under the Act, I express no opinion as to whether Travis's initial allegations would have also triggered those duties.

ry response required by law, once he became aware of Girlfriend's allegation of domestic violence, Jones had a duty to use all reasonable means to protect her and to prevent further violence between Travis and Girlfriend that night. Whether Jones failed to comply with his law enforcement duties as required by the Act, and whether such failure was committed knowingly and with the intent to benefit himself or Travis, *see* Utah Code Ann. § 76–8–201, are ultimately questions for the fact-finder. Consequently, I would reverse the magistrate's dismissal of the official misconduct charge and remand for further proceedings. I therefore dissent from the lead opinion on this point.